**Annette M. ALLEN, Shelley S. Burnette, Earnest Leonard, Brian R. Marshall, and Rahpre Newberry, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**CHICAGO TRANSIT AUTHORITY, Defendant.**

No. 99 C 7614.

United States District Court, N.D. Illinois, Eastern Division.

Jan. 10, 2001.

Carolyn Shapiro, Miner Barnhill & Galland, Chicago, IL, for Plaintiff.

Paula Ketchem, Schiff, Hardin & Waite, Chicago, IL, for Defendant.

## MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

Before the court is the motion of plaintiffs Annette Allen, Shelley Burnette, Earnest Leonard, and Rahpre Newberry, to compel production of certain documents from defendant Chicago Transit Authority ("CTA").

## I. BACKGROUND

The plaintiffs are African–American CTA employees who allege they were victims of racial discrimination in terms of promotion and pay. Two of the plaintiffs filed their lawsuit in November of 1999; three more were added in February of 2000. Currently at issue are seven documents the CTA is withholding from discovery under various claims of privilege-attorney-client, work product, and deliberative process. The documents are apparently related to the CTA's investigation of plaintiffs' internal charges of discrimination, and are described in a revised privilege log the CTA produced pursuant to this court's order of September 19, 2000.

Given the CTA's reliance on both the work product doctrine and the deliberative process privilege as to all seven documents in this dispute, our central focus must be the circumstances that gave rise to the production of these materials. The only evidence regarding the CTA's procedure for handling internal complaints of discrimination is provided by the plaintiffs: the affidavit of Pamela Beavers, general manager of the CTA's EEO department. (*Memorandum in Support of Plaintiffs' Renewed Motion,* Ex. D).

Internal complaints of discrimination are investigated by the CTA's affirmative action unit ("AAU"). These often begin as "inquiries," a number of which turn into "formal, internal complaints of discrimination." (*Id.* at ¶¶ 5–6). Formal complaints before the AAU are resolved in one of three ways: (1) through alternative dispute resolution; (2) termination of AAU action upon the filing of an external charge; or (3) full investigation culminating in a final recommendation. (*Id.* at ¶ 7). According to Ms. Beavers, in the cases of Allen, Burnette, and Marshall, once the AAU learned that outside charges were filed, it terminated its investigation and referred the matters to the CTA's legal department. (*Id.* at ¶ 11). Unfortunately, Ms. Beavers does not indicate when this occurred; we do note that Allen and Burnette filed external charges on October 24, 1997. She states that she sometimes becomes involved at the early stages of an investigation, and when she does, she usually consults with the legal department because there is a threat that the internal complaint will result in litigation. (*Id.* at ¶ 15). She does not suggest that this occurred in the case of any of the complaints at issue here.

The CTA submits that all seven documents at issue are protected from discovery by both the work product doctrine and the deliberative process privilege. In addition, it claims one of the documents is also protected by the attorney-client privilege. Before examining these claims, we briefly set out the requirements for establishing each of these privileges. Then we assess whether the CTA has met those requirements as to each document. As per our order of September 19, 2000, we assess the CTA's submissions pursuant to *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.* 145 F.R.D. 84 (N.D.Ill.1992).[1]

---

1. The *Allendale* ruling required:

 discovery opponents to produce a privilege log listing each separate document they claim to be beyond discovery, described in the following separate categories. For each document, the log should identify the date, the author and all recipients, along with their capacities. The log should also describe the document's subject matter, purpose for its production, and a specific explanation of why the document is privileged or immune from discovery. These categories, especially this last category, must be sufficiently detailed to allow the court to determine whether the discovery opponent has discharged its burden of establishing the requirements expounded upon in the foregoing discussion. Accordingly, descriptions such as "letter re claim," "analysis of claim," or "report in anticipation of litigation"—with which we have grown all too familiar—will be insuffi-

## II. ANALYSIS

### A. Attorney–Client Privilege

■ The CTA argues that one of the documents from the Leonard complaint file, authored on October 15, 1998, by the vice president of communications and sent to an EEO Coordinator, is protected from discovery by the attorney-client privilege. The party seeking to withhold materials from discovery bears the burden of establishing the essential elements to demonstrate the materials are privileged. *United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir.1997). The elements have been summarized as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected from disclosure by himself or by the legal adviser, (8) except the protection may be waived.

*Id.* (*quoting* 8 John Henry Wigmore, Evidence in Trials at Common Law § 2292) (John T. McNaughton rev.1961). Furthermore, the privilege must be established on a document-by-document basis; a blanket claim failing to specify what information is protected will not suffice. *United States v. White,* 970 F.2d 328, 334 (7th Cir.1992).

■ It is important to remember that, because the privilege impairs the court's search for the truth, it is narrowly construed. *Evans,* 113 F.3d at 1461. Not all information transmitted to an attorney becomes cloaked with the privilege. *White,* 970 F.2d at 334. For example, when information is transmitted to an attorney with the intent that it be transmitted to a third party, the material is not privileged. *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983). In the end, however, the question is: does the document in question reveal, directly or indirectly, the substance of a confidential attorney-client communication. *Ohio–Sealy Mattress Mfg.*

*Co. v. Kaplan,* 90 F.R.D. 21, 28 (N.D.Ill. 1980).

■ The CTA's submissions give the court little to go on with respect to this document. We note that Leonard was added to this lawsuit in February of 2000, about sixteen months after the document at issue was created. According to the CTA's brief description, this document "refers to attorney-client communications," but it is neither authored nor reviewed by an attorney. In addition, the CTA does not indicate when the Leonard matter was handed over to the legal department; if it was prior to the date of this document, the court would be more amenable to finding that legal advice was discussed in the document. Also, the fact that the document was prepared by the vice president of communications, as opposed to an EEO investigator, calls into question the nature of the document. Without more specific information regarding this document, however, we cannot find it protected by the attorney-client privilege.

### B. Work Product Doctrine

■ As with the attorney-client privilege, the burden is on the discovery opponent to establish that the work product doctrine immunizes the documents at issue from discovery. *U.S. v. Hamilton,* 19 F.3d 350, 354 (7th Cir.1994) (evidentiary privileges in general); *Binks Mfg. Co. v. Nat. Presto Industries Inc.,* 709 F.2d 1109, 1119 (7th Cir.1983) (work product doctrine specifically). The work product doctrine is distinct from, and broader than, the attorney-client privilege. *In Re Air Crash Disaster at Sioux City, Iowa,* 133 F.R.D. 515, 519 (N.D.Ill.1990) ( *citing United States v. Nobles,* 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170 n. 11, 45 L.Ed.2d 141 (1975)). The work product doctrine developed to protect the work of an attorney from encroachment by opposing counsel. *Binks,* 709 F.2d at 1109. It consists of a multi-level protection whereby that information most closely related to an attor-

cient. This may be burdensome, but it will provide a more accurate evaluation of a discovery opponent's claims and takes into consideration the fact that there are no presumptions operating in the discovery opponent's favor. Any failure to comply with these di-

rections will result in a finding that the plaintiff-discovery opponents have failed to meet their burden of establish the applicability of the privilege.
145 F.R.D. at 88.

ney's litigation strategy is absolutely immune from discovery, while that information with a more tenuous relationship to litigation strategy might be available in circumstances evincing a substantial need or undue hardship on the part of the discovery proponent. Fed. R.Civ.P. 26(b)(3). Accordingly, information that is merely factual may not be withheld under the umbrella of work product but must be available, if not through the production of otherwise protectible documents, then through interrogatories or depositions. 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure, § 2023, at 194.

The threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared in anticipation of litigation. *Binks,* 709 F.2d at 1118. The determination of whether materials are prepared in anticipation of litigation, however, while central to the work product doctrine, eludes precision. This is especially the case in certain contexts, where the discovery opponent routinely performs investigations and accumulates files even when no litigation ensues.

 Ordinarily, we have found it helpful to express the elements of the work product doctrine into the concepts of "causation" and "reasonable anticipation" of litigation. *Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.,* 145 F.R.D. 84, 87 (N.D.Ill.1992). There is a "causation" element insofar as production of the material must be caused by the anticipation of litigation. *Id.* If materials are produced in the ordinary and regular course of a discovery opponent's business, and not to prepare for litigation, they are outside the scope of the work product doctrine. Fed. R.Civ.P. 26(b)(3) (advisory committee notes). Accordingly, even if litigation is imminent, there is no work product immunity for documents prepared in the ordinary course of business rather than for litigation purposes. *Binks,* 709 F.2d at 1118. That is to say, the mere fact that a discovery opponent anticipates litigation does not qualify an "in-house" document as work product. *Janicker,* 94 F.R.D. at 650.

 As for "anticipation of litigation," courts have made clear that, because litiga-

tion can be anticipated at the time almost any incident occurs, a "substantial and significant threat of litigation" is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document. *Allendale,* 145 F.R.D. at 87. Demonstration of a substantial and significant threat requires a showing of objective facts establishing an identifiable resolve to litigate. *Id.* The fact that litigation ensues or that a party retains an attorney, initiates an investigation, or engages in negotiations over a claim, is not dispositive on the issue of whether litigation was anticipated. *Id.* (*citing Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 660 (S.D.Ind.1991)) (collected cases). We consider whether plaintiffs' descriptions of the documents are sufficient to allow for an evaluation of their assertion of work product immunity. That is, plaintiffs' descriptions must allow the court to assess whether the documents in question were prepared in anticipation of litigation given the elements discussed above.

 Bearing in mind all these factors, it can be summarized that, in order to establish work production protection for a document, a discovery opponent must show that "the primary motivating purpose behind the creation of a document . . . must be to aid in possible future litigation," under circumstance where the discovery opponent can show "objective facts establishing an identifiable resolve to litigate." Only by strictly construing the elements of work product, can the doctrine's original intent be best served. That intent is to protect the adversarial process by providing an environment of privacy in which a litigator may creatively develop strategies, legal theories, and mental impressions outside the ordinary liberal realm of federal discovery provisions, thereby insuring that the litigator's opponent is unable to ride on the litigator's wits.

As already noted, the CTA claims the work product doctrine applies to all seven documents at issue. According to the CTA, once an employee files an internal complaint, the material it prepares constitutes work product. (*Defendant's Supplemental Response,*

at 4). This stance—tantamount to the type of blanket work product claim courts routinely reject—is not supported by Ms. Beavers affidavit, which indicates that the threat of litigation is perceived in different instances in different cases, but always when an *external* charge is filed. Indeed, according to the affidavit, internal charges are often resolved without litigation. What is missing from the CTA's submissions is "a showing of objective facts establishing an identifiable resolve to litigate." *Allendale,* 145 F.R.D. at 87. In other words, because the evidence before the court shows that not all internal charges lead to litigation, the CTA must show what it was about the charges at issue here that set them apart.

■ The descriptions in the privilege log are less than helpful. Four documents—one each for the claims of Leonard, Newberry, Burnette, and Allen—are described identically as "Analysis of investigation, findings, disposition, and recommendation regarding complaint." Two more are called "Comparison of candidates for promotion at issue," involving the Burnette and Allen complaints. The CTA fails to provide a date for any of these six documents, making it difficult for the court to judge its claim in reference to the outline of internal procedure provided by Ms. Beavers' affidavit. No attorneys were involved in the production or review of any of the documents—all documents were authored by either an equity officer for the EEO service or an EEO coordinator. According to the affidavit, the EEO internal investigation ceases once external charges are brought; since these documents still evince EEO department involvement, we assume that external charges were not yet filed, and attorney involvement had not yet taken place. Although Ms. Beavers indicates that there are occasions where EEO consults with the legal department earlier—when there is a threat that an internal complaint will result in litigation—she does not suggest that this occurred in the case of any of the plaintiffs' complaints. Accordingly, we cannot accept the CTA's claim that these items constitute work product.

■ The last of the seven documents, dated October 15, 1998, and referring to the Leonard complaint, is described as "Handwritten notes and memorandum regarding investigation. Both refer to attorney-client communications." This was authored by an EEO coordinator and sent to the vice president of communications. As already noted, Leonard was added to this suit sixteen months after this document was created. It would appear that his complaint was not yet referred to the legal department, and that it was not yet considered a threat of litigation. Consequently, we cannot find this document to be work product.

### C. *Deliberative Process Privilege*

■ The CTA also claims all seven of the documents at issue are protected from discovery by the federal common law deliberative process privilege. The party asserting a privilege has the burden of establishing both its existence and applicability. *United States v. Illinois,* 148 F.R.D. 587, 590 (N.D.Ill.1993); *Scott v. Lewis,* 139 F.R.D. 353, 355 (N.D.Ill.1991). The initial question regarding the deliberative process in this case is whether it may be invoked by a municipal agency like the CTA. Although the court invited the parties to brief issues relating to the deliberative process in this case, neither party addresses this question. Instead, the CTA relies to a great degree on *Bobkoski v. Board of Educ.,* 141 F.R.D. 88 (N.D.Ill.1992), where the court applied the federal common law privilege to protect school board meeting notes relating to employment issues from discovery. One of the issues raised in that case was whether the privilege could be invoked by a state agency. In ruling that the privilege was available to a state agency, the court cited *Moorhead v. Lane,* 125 F.R.D. 680 (C.D.Ill.1989), and *N.O. v. Callahan,* 110 F.R.D. 637 (D.Mass.1986). In *Moorhead,* the court based a great deal of its holding on its interpretation of Illinois law as favoring the application of a deliberative process privilege. 125 F.R.D. at 682–84. Similarly, the *Callahan* court also relied to a large extent on state law to support its holding favoring the deliberative process privilege. 110 F.R.D. at 642–43. Following these holdings, the *Bobkoski* court, too, found the

deliberative process privilege available to state agencies. 141 F.R.D. at 92.[2]

Since the *Bobkoski* ruling, however, the Illinois Supreme Court has spoken plainly on the issue in *Birkett v. City of Chicago,* by refusing to recognize a deliberative process privilege. 184 Ill.2d 521, 534, 235 Ill.Dec. 435, 705 N.E.2d 48, 54 (1998). Indeed, the court upheld an appellate court ruling that called into question the decisions in *Bobkoski* and *Moorhead. People ex rel. Birkett v. City of Chicago,* 292 Ill.App.3d 745, 752–53, 226 Ill. Dec. 717, 686 N.E.2d 66, 71–72 (2nd Dist. 1997). Given these developments in Illinois law, we are unwilling to accept as persuasive the holdings in *Bobkoski* or *Moorhead.* As the CTA proceeded no further than these cases in its argument, we cannot find it has established the existence of a federal common law deliberative process for municipal agencies.

 Even if the CTA had succeeded in meeting its burden, we would have to find the deliberative process privilege not applicable in this case. The privilege protects communications that are part of the decision-making process of a governmental agency. *U.S. v. Farley,* 11 F.3d 1385, 1389 (7th Cir. 1993) (citing *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 150–52, 95 S.Ct. 1504, 1516–17, 44 L.Ed.2d 29 (1975)). It is designed to protect communications that are part of the decision-making process of a government agency. *Id.* More specifically:

> serves to assure that subordinates within an agency will feel free to provide the decision maker with their uninhibited opinions and recommendations without fear of being subject to public ridicule or criticism; to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to pro-

tect against confusing the issues or misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action.

*K.L. v. Edgar,* 964 F.Supp. 1206, 1208 (N.D.Ill.1997) (quoting *King v. Internal Revenue Service,* 684 F.2d 517, 519 (7th Cir. 1982)). Because the deliberative process exists to protect the governmental decision-making process, a document is protected under the privilege only if it is "predecisional"—generated before the adoption of an agency policy-and "deliberative"—reflective of the give and take of the consultative process. *Id.*

 The documents the CTA seeks to protect here are difficult to fit within the confines of the deliberative process privilege. To fall within the privilege, materials must relate to the formulation or exercise of agency policy-oriented judgment. *Petroleum Info. Corp. v. U.S. Dept. of Interior,* 976 F.2d 1429, 1435 (D.C.Cir.1992). The documents at issue here relate to internal discrimination charges, rather than to the consultative process leading up to the adoption of an agency decision or policy. Indeed, as the plaintiffs point out, it is questionable whether the CTA can be said to hold the status of a public policy-maker. The CTA's submissions on this issue do not convince us otherwise.

 Yet another problem for the CTA is its failure to properly assert the privilege. According to applicable law in this district, in order for a governmental agency to assert the deliberative process privilege:

> (1) the department head with control over the matter must make a formal claim of privilege, after personal consideration of

---

**2.** Fed.R.Evid. 501 supplies the starting point in determining whether an evidentiary privilege exists:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experi-

ence. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State or political subdivision thereof shall be determined in accordance with State law.

Here, where we have a federal question, the federal common law must be the source of any privilege. Both *Moorhead* and *Bobkoski* noted this, but also noted that examination of state law in such an instance was useful.

the problem; (2) the responsible official must demonstrate, typically by affidavit, precise and certain reasons for preserving the confidentiality of the documents in question; and (3) the official must specifically identify and describe the documents. *Edgar*, 964 F.Supp. at 1209. The record before the court does not include a formal assertion of the deliberative process privilege by the CTA meeting these requirements. Based on the foregoing discussion, we must find that the CTA has failed to establish both the existence *and* the application of the deliberative process privilege as to the documents at issue in this case. Accordingly, we cannot find those documents to be protected from discovery.

### III. *CONCLUSION*

For the foregoing reasons, the plaintiffs' motion to compel production of the seven documents at issue is hereby GRANTED.